# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00498-CR

**Ronnie Lee Natho Sr., Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF LLANO COUNTY, 424TH JUDICIAL DISTRICT
## NO. CR 6193, HONORABLE DANIEL H. MILLS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Ronnie Lee Natho Sr. of misapplication of an elderly person's fiduciary property and sentenced him to twenty-five years' imprisonment. *See* Tex. Penal Code § 32.45(b). Natho complains that the evidence is insufficient to support the verdict and that the trial court erred in denying his request for a mistrial. We affirm the judgment of conviction.

## Factual Summary[1]

In July 2005, Rosie Shelton signed a statutory durable power of attorney appointing Natho,[2] her former grandson-in-law, to act as her agent and attorney-in-fact and giving him the general authority to act on Shelton's behalf, including with regard to Medicaid issues. The document

---

[1] The parties are familiar with the facts and we will therefore present as brief a recitation as possible for purposes of this opinion.

[2] Natho was married to Peggy Burthold, Shelton's granddaughter, from 2002 through 2004.

included "[s]pecial instructions applicable to gifts" and stated that Shelton had to initial beside the provision if she wanted Natho to have the power to make gifts from her estate. Shelton did not initial the "gift paragraph," and Shelton's attorney James Herbort testified unequivocally that Natho did not have the right to make gifts under the power of attorney. In late 2007 and early 2008, Shelton was admitted to a hospital and then moved into a nursing home, no longer able to care for herself.

On April 24, 2008, Natho transferred to himself ownership of Shelton's automobile. In early August, Shelton became upset when she received a letter from her insurance company saying that ownership of her $3,000 life insurance policy had been transferred to Natho. On August 14, Natho signed a general warranty deed, deeding Shelton's house to himself in exchange for $10; Shelton retained a life estate and continuing control, including the right to sell or lease the property, and Natho received a remainder interest, assuming Shelton did not dispose of the property or otherwise act to take back that interest. On August 15, a friend of Shelton's noticed Shelton's car was gone and that the locks to Shelton's house had been changed. She immediately informed Shelton, and she testified that she did not think that Shelton knew Natho had given himself Shelton's car or any interest in the house.

Peggy Burthold, Shelton's granddaughter and Natho's former wife, testified that she did not know Shelton was in a nursing home until early September 2008, when Herbort called to say Shelton wanted to talk to her. Burthold was initially turned away from the nursing home because Natho had left instructions that she was not allowed to see Shelton, but she spoke to Herbort and was eventually allowed in. On September 4, Shelton revoked Natho's power of attorney and signed a new one in favor of Burthold.

2

On September 5, Herbort sent Natho a letter instructing him that he was no longer authorized to act for Shelton and asking him to return Shelton's property, including keys, bank information, and insurance policies. On September 22, Natho sold Shelton's car to a third-party, receiving between $4,750 and $5,600,[3] and on about September 26, he cashed out the life insurance policy, receiving $1,746. Burthold said that excluding Shelton's house, Natho gave himself about $5,000 to $10,000.

Kim Kernodle, an attorney who helps clients qualify for Medicaid, testified for the defense and said that Natho came to see her about Shelton's needs in July 2008. Kernodle told Natho he could pay for the nursing home from Shelton's assets until she had less than $2,000 left and then apply for Medicaid, or he could choose a "spend-down" option, meaning "he could basically spend the money, which would include some gifts and that those gifts would incur a penalty," making Shelton eligible for Medicaid after the expiration of a penalty period; Natho chose the spend-down option.

Kernodle said it was "legal" for Natho to make gifts to himself as long as Shelton's needs were met and advised him to execute the warranty deed for the house to fulfill Shelton's wishes as expressed in her will that Natho be her sole beneficiary. She said that Shelton retained full control over the property, and that the gift of the property did not become complete until Shelton's death. Kernodle said that she would not have changed her spend-down advice if Shelton had named other beneficiaries in her will but that it would have affected "who we recommended gifts be made

---

[3] Records from the Texas Department of Motor Vehicles show that Natho received $5,600 for the vehicle, but $4,750 was referenced elsewhere in the testimony.

to. So if there had been another beneficiary in her will then we would not have allowed Mr. Natho to only gift to himself. We would have had him make gifts according to the terms of the will." Kernodle acknowledged that Natho's transfer of the car into his name occurred before he came to her for advice and that Shelton's house, car, and $1,500 of the cash value of her life insurance policy would have been excluded from Medicaid's calculations.

Kernodle said that, excluding the house, Natho gave himself a total of $27,560 in "gifts" from Shelton's estate—the car, the cash value of the insurance policy, and a check for $24,276. However, her records valued the car at $1,535 and she did not know that Natho actually received significantly more than $1,535. Kernodle did not believe Natho did anything to "the detriment" of Shelton, but she also testified that by choosing the spend-down option, Natho preserved assets that would have passed to him as beneficiary under her will.

One of Shelton's nurses testified that Shelton suffered from Alzheimer's, depression, anxiety disorder, and delusions. She did not think Shelton was competent in January 2008, but agreed that some of Shelton's physical ailments can result in mental confusion. She also agreed that in late March 2008, Shelton showed no impairment in her long-term memory, moderate impairment in her short-term memory, a logical non-delusional thought process, appropriate use of speech, and increased alertness. Psychologist Christopher Dalton regularly interacted with Shelton at the nursing home and said she was able to answer his questions appropriately, volunteer relevant information, discuss issues, and carry on conversations. Dalton remembered that Shelton was distressed about her estate and legal affairs in the summer and fall of 2008, and he believed she was competent when she changed her will and power of attorney.

4

In her deposition taken February 4, 2010, Shelton testified that she had not given Natho permission to take title to her house, sell her car, change the ownership of her life insurance policy, or write checks to himself on any of her bank accounts. During the deposition, Shelton frequently could not remember the answers to questions she was asked and sometimes seemed confused, such as when asked about the location of her house. At a deposition taken in November 2008, Natho admitted that he had probably spent $10,000 of Shelton's money on his own behalf.

**Sufficiency of the Evidence**

In his first point of error, Natho argues that the evidence is insufficient to support the jury's verdict. We disagree.

We review evidentiary sufficiency by viewing all of the evidence in the light most favorable to the verdict and asking whether a rational jury could have found guilt beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899, 912 (Tex. Crim. App. 2010). A person misapplies fiduciary property if he holds property in a fiduciary capacity; intentionally, knowingly, or recklessly deals with the property contrary to the agreement under which he held the property; and the misapplication involves a substantial risk of loss to the property owner. Tex. Penal Code § 32.45. Natho argues that the evidence is insufficient to show (1) that he and Shelton had an agreement about how he was to handle Shelton's property; (2) that he acted contrary to that agreement, claiming that the power of attorney gave him the authority to "perform or undertake any action in her name that she could have performed or undertaken herself"; (3) that his actions were contrary to the power of attorney; or (4) that any misapplication gave rise to a substantial risk of loss to Shelton. He asserts that the evidence establishes that while he was Shelton's attorney-in-fact, he acted only to assist her

5

and to qualify her for Medicaid coverage as soon as possible. Natho also contends that, because there was no evidence about what happened to the money he received from Shelton's assets, the evidence is insufficient to show that the funds were used in a way that was inconsistent with Shelton's wishes or needs. We disagree.

Natho was convicted of misapplication of fiduciary funds valued at more than $1,500 but less than $20,000. Shelton gave Natho a general power of attorney, which is evidence of her agreement with Natho about how he would handle her assets. However, she did not grant him the authority to make gifts of her assets, and she testified that she did not give him permission to give himself the car or her life insurance policy. *See Gouldy v. Metcalf*, 12 S.W. 830, 831 (Tex. 1889) (authority conferred by power of attorney will be strictly construed to exclude exercise of any power not warranted by document's actual words or "as a necessary means of executing the authority with effect"). Thus, the jury could have concluded that Natho acted contrary to his agreement with Shelton in making gifts to himself from her estate. Furthermore, Natho signed the car over to himself in April 2008, well before he consulted with Kernodle, and so cannot claim to have been relying on Kernodle's legal advice in doing so. Likewise, Shelton's car, house, and most of the cash value of the life insurance policy were all assets that would be excluded from Medicaid's calculations, and so their transfer out of Shelton's estate did not benefit Shelton.

Although he "gifted" the car and life insurance policy to himself while he had power of attorney, he was instructed to return Shelton's property by Herbort's September 5 letter. Instead of transferring those assets back into her name, he sold the car for between $4,750 and $5,600 on September 22, and cashed in the life insurance policy for $1,746 on September 25; there is no

6

evidence that he returned those proceeds to Shelton's estate. The jury could have inferred that he did not use those proceeds on Shelton's behalf or in a way that was consistent with her wishes. The evidence is sufficient to support the jury's determination that Natho misapplied assets valued between $1,500 and $20,000. *See Dwyer v. State*, 836 S.W.2d 700, 702 (Tex. App.—El Paso 1992, pet. ref'd) (defendant received cash from clients and applied to his own expenses, not to client's utility accounts; evidence was sufficient to show defendant misapplied fiduciary funds in manner that involved substantial risk of loss to property owners). We overrule Natho's first point of error.

## Motion for Mistrial

In his second point of error, Natho contends that the trial court should have granted his motion for a mistrial after Burthold violated a motion in limine by stating that a temporary injunction had been granted against him. He asserts that the harm resulting from that statement could not have been cured by an instruction to disregard. We disagree.

We review a trial court's decision on a motion for mistrial under an abuse of discretion and will only reverse if we find that prejudice was incurable and the error was so harmful "that the case must be redone." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). Unless the record reflects otherwise, we assume that the jury complied with a trial court's instruction to disregard. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). An instruction to disregard will only be insufficient if the evidence leads to prejudice to a degree that it would be impossible to withdraw "the impression produced on the minds of the jurors." *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).

7

Burthold filed a civil suit against Natho, and the jury knew about the existence of the civil case and even that there had been a hearing on a motion for temporary injunction. The parties largely avoided discussing the civil case and whether the injunction had been granted, in keeping with the trial court's granting of the motion in limine. During Burthold's testimony, she was asked about her understanding of the effects of the warranty deed signed by Natho and whether she believed that, as soon as Shelton died, the house went to Natho. She answered, "I understood that before the temporary restraining order due to the cases, yes." Natho's attorney objected that Burthold had violated the motion in limine, and the trial court responded that it would give an instruction, saying, "[T]hey have talked about a trial and they know they—there's been all kinds of hearings here." Natho argued that he was harmed because the jury would believe that the granting of a temporary injunction "pretty much amounts to a—respectfully, a statement by the Court as to the weight of the evidence in this case because it's the same evidence." The court denied Natho's motion for a mistrial and gave the jury a limiting instruction telling them not to draw any inferences related to any rulings in the civil litigation.

On appeal, Natho argues that Burthold's statement would have led a rational juror to conclude that a judge had already found wrongdoing by Natho and that, because the evidence is "insufficient to support [Natho's] guilt in this case to begin with," the trial court's instruction would not have cured the harm suffered by Natho. However, the record contains no indication that the jury did not follow the trial court's instruction, *see Thrift*, 176 S.W.3d at 224, and Burthold's statement was brief and vague enough that we cannot conclude that the trial court abused its discretion in refusing Natho's motion for a mistrial, *see Hawkins*, 135 S.W.3d at 77. We overrule Natho's second point of error.

## Conclusion

Having overruled both of Natho's points of error, we affirm the trial court's judgment of conviction.

_____

David Puryear, Justice

Before Justices Puryear, Goodwin and Field

Affirmed

Filed:   February 6, 2104

Do Not Publish

9